EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| José Méndez Moll, Edith Román Hernández<br><br>Recurridos<br><br>v.<br><br>AXA Equitable Life Ins. Co.; Luis A. Gesualdo Pérez; Aseguradoras A, B y C<br><br>Peticionarios | Certiorari<br><br>2019 TSPR 104<br><br>202 DPR ____ |
|---|---|

Número del Caso: CC-2016-494

Fecha: 31 de mayo de 2019

Tribunal de Apelaciones:

Región Judicial de Ponce Aibonito – Panel Especial

Abogados de la parte peticionaria:

Lcdo. Oreste R. Ramos
Lcda. Frances R. Pesquera
Lcdo. Javier José Díaz Rivera
Lcdo. Salvador Antonetti Stutts

Abogados de la parte recurrida:

Lcdo. Alfredo Fernández Martínez
Lcda. Cassandra Voltaggio Figueroa

Materia: Sentencia con Opinión de conformidad y Opinión disidente.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| José Méndez Moll, Edith Román Hernández<br><br>Recurridos<br><br>v.<br><br>AXA Equitable Life Ins. Co.;<br>Luis A. Gesualdo Pérez;<br>Aseguradoras A, B y C<br><br>Peticionarios | *Certiorari*<br><br>CC-2016-0494 | |

SENTENCIA

En San Juan, Puerto Rico, a 31 de mayo de 2019.

Examinado el recurso presentado por los Peticionarios, así como los escritos presentados por ambas partes, se dicta Sentencia mediante la que se confirma la Sentencia recurrida. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos.

Lo acordó y manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Jueza Asociada señora Pabón Charneco emitió una Opinión de Conformidad a la que se une el Juez Asociado señor Kolthoff Caraballo, el Juez Asociado señor Rivera García y el Juez Asociado señor Estrella Martínez. El Juez Asociado señor Martínez Torres emitió una Opinión Disidente a la que se le unió el Juez Asociado señor Feliberti Cintrón.

José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| José Méndez Moll, Edith Román Hernández | | *Certiorari* |
| :--- | :--- | :--- |
| Recurridos | | |
| v. | CC-2016-0494 | |
| AXA Equitable Life Ins. Co.; Luis A. Gesualdo Pérez; Aseguradoras A, B y C | | |
| Peticionarios | | |

Opinión de Conformidad emitida por la Jueza Asociada señora Pabón Charneco a la que se unen los Jueces Asociados señor Kolthoff Caraballo, señor Rivera García y señor Estrella Martínez.

En San Juan, Puerto Rico, a 31 de mayo de 2019.

El presente recurso nos brinda la oportunidad de examinar la aplicabilidad de la Ley Núm. 60 de 18 de junio de 1963, según enmendada, conocida como la Ley Uniforme de Valores de Puerto Rico, 10 LPRA sec. 851 *et seq* ("Ley Uniforme de Valores"). En primer lugar, nos permite analizar si las anualidades variables constituyen un valor bajo el Artículo 401(l) de la Ley Uniforme de Valores, 10 LPRA sec. 881(l). En segundo lugar, nos permite evaluar si un inversionista agraviado por una transacción de valores tiene a su disposición causas de acciones adicionales a las instituidas en la Ley Uniforme de Valores.

A continuación, exponemos los antecedentes fácticos que dieron génesis a la controversia de autos.

I

A sus **sesenta y dos (62) años de edad**, el Sr. José Méndez Moll empezó a investigar posibles productos de inversión en miras a su retiro. Como parte de sus gestiones contactó a un agente de seguros y representante de *AXA Equitable Life Insurance Company* ("AXA"), el Sr. Luis A. Gesualdo Pérez. Estos se reunieron varias veces entre noviembre de 2003 y enero de 2004. El señor Méndez Moll le indicó al señor Gesualdo Pérez que interesaba un producto de inversión que le produjera una anualidad fija de setenta y dos mil dólares ($72,000.00) ($6,000.00 mensuales) a la vez que le aseguraba su aportación inicial. El señor Gesualdo Pérez le recomendó un producto llamado *Accumulator Plus* y le mostró varias proyecciones de lo que sería el rendimiento de su inversión.

El 21 de enero de 2004 el señor Méndez Moll le entregó seiscientos mil dólares ($600,000.00) a AXA como aportación inicial para su producto, el *Accumulator Plus*. Desde enero de 2004 hasta septiembre de 2009 **retiró** dieciocho mil dólares ($18,000.00) trimestrales ($6,000.00 mensuales). A partir del 2009, por recomendación del señor Gesualdo Pérez, solo **retiró** nueve mil dólares ($9,000.00) trimestrales ($3,000.00 mensuales). Preocupado por la reducción en el balance de su cuenta, el señor Méndez Moll

trató de comunicarse con el señor Gesualdo Pérez, pero no tuvo éxito.

El 13 de febrero de 2013, el señor Méndez Moll, su esposa Edith Román Hernández, y la Sociedad Legal de Gananciales compuesta por ambos ("los recurridos"), demandaron a AXA y al señor Gesualdo Pérez. AXA presentó una Moción de Desestimación bajo la Regla 10.2(5) de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 10.2(5), en la que adujo que el término prescriptivo aplicable a las reclamaciones instadas en su contra era el término de dos (2) años dispuesto en el Artículo 410(e) de la Ley Uniforme de Valores y, como corolario, las reclamaciones en su contra estaban prescritas. Los recurridos, por su parte, se opusieron y adujeron que el producto en cuestión no era un valor y, por lo tanto, la Ley Uniforme de Valores era inaplicable.

El 5 de noviembre de 2013, el foro primario dictó una Sentencia Parcial en la cual, *inter alia*, ordenó la celebración de una Vista Evidenciaria para determinar si el producto adquirido por el señor Méndez Moll era un "valor" según definido en la Ley Uniforme de Valores y, de esta forma, evaluar si las reclamaciones esbozadas en la Demanda de los recurridos estaban prescritas.

En la Vista Evidenciaria testificó, *inter alia*, el Sr. Sidney James Smith, el señor Gesualdo Pérez y el señor Méndez Moll. Del testimonio del señor James Smith surge que laboró para AXA casi cuarenta (40) años y entre los

años 2001 y 2008 trabajó en la distribución del *Accumulator Plus*. Definió dicho producto como una anualidad variable que permite al comprador colocar la contribución inicial en distintos vehículos de inversión sujeto a las fluctuaciones del mercado. Añadió que existe una creencia histórica de que las anualidades variables pueden crear un valor, a largo plazo, para la jubilación. Por otra parte, indicó que en las anualidades fijas no hay riesgo de perder el principal invertido porque el rendimiento de la contribución no depende de las fluctuaciones del mercado.

El señor Gesualdo Pérez afirmó ser agente de seguros desde hace más de treinta (30) años. Aproximadamente en el año 1985 obtuvo la licencia <u>Serie 6</u> que le permite vender, *inter alia*, **anualidades variables**. La licencia fue expedida por la extinta *National Association of Securities Dealers, Inc.* (NASD), sucedida desde el 2007 por el *Financial Industry Regulatory Authority* (FINRA). Las regulaciones de FINRA obligan al señor Gesualdo Pérez a tomar cursos de educación continua sobre productos, ética y supervisión.[1] Este declaró que la *Accumulator Plus* es "una anualidad variable con un punto fijo de interés que está diseñada para retiro a largo plazo, ingreso y crecimiento".[2]

---

[1] Sentencia emitida por el Tribunal de Primera Instancia el 30 de octubre de 2015, pág. 15.

[2] *Íd.*

El señor Gesualdo Pérez declaró que **desde el 2001 habló con el señor Méndez Moll de anualidades;** que se reunió con este en muchas ocasiones; que **en el 2001 no hizo un perfil del señor Méndez Moll** como cliente sino que **lo realizó el 21 de enero de 2004, fecha en la que el señor Méndez Moll compró el producto.**[3] Admitió que el señor Méndez Moll deseaba recibir un ingreso mensual fijo de seis mil dólares ($6,000.00) por un término mínimo de diez (10) años, por lo que realizó la proyección tomando en consideración **retiros mensuales** por dicha cantidad.[4]

Respecto al *Accumulator Plus* que le recomendó y vendió al señor Méndez Moll, el señor Gesualdo Pérez afirmó que era una anualidad variable. Asimismo, admitió que el señor Méndez Moll le indicó que interesaba dinero para su retiro, por lo que **quería una anualidad fija que le rindiera seis mil dólares ($6,000.00) mensuales y le asegurara la contribución inicial de seiscientos mil dólares ($600,000.00).**

El señor Méndez Moll declaró que a finales del año 2003 y principios del 2004 esperaba una buena suma de dinero y estaba pensando seriamente en su retiro. Por tal razón, contactó al señor Gesualdo Pérez. Indicó que acordó con el señor Gesualdo Pérez invertir seiscientos mil dólares ($600,000.00) por diez (10) años y enfatizó que

---

[3] *Íd.*, pág. 17.

[4] *Íd.* En la sección de observaciones y comentarios del formulario intitulado *Client Profile* el señor Gesualdo Pérez expresó que el deseo del señor Méndez Moll era "[t]o receive a monthly income with a time horizon about 10 or more years". Véase: Petición de *Certiorari*, Apéndice, págs. 1198

necesitaba recibir seis mil dólares ($6,000.00) mensuales ($72,000.00 anuales) mientras le aprobaban el Seguro Social. Afirmó que el señor Gesualdo Pérez le explicó que podría recibir más de seiscientos mil dólares ($600,000.00) pero nunca menos de dicha cantidad.

El Tribunal de Primera Instancia declaró No Ha Lugar las mociones de desestimación. Sostuvo que el *Accumulator Plus* que el señor Méndez Moll adquirió era una anualidad fija y que el señor Méndez Moll lo adquirió con la intención de adquirir una anualidad fija, la cual no es catalogada como "valor" bajo la Ley Uniforme de Valores. Así las cosas, resolvió que el caso de autos versaba sobre un incumplimiento de contrato regulado por el Código Civil, por lo que el término prescriptivo aplicable era el de quince (15) años, según dispuesto en el Art. 1864 del Código Civil de Puerto Rico, 31 LPRA sec. 5294.

Inconforme, los peticionarios acudieron al Tribunal de Apelaciones vía *certiorari*. Adujeron que el foro primario erró al determinar que el producto en cuestión era una anualidad fija y no una anualidad variable regida por la Ley Uniforme de Valores. El foro *a quo* emitió una Sentencia en la que confirmó al foro primario tras resolver que el *Accumulator Plus* que compró el señor Méndez Moll era una anualidad fija.

Aún insatisfecho, los peticionarios acudieron ante nos vía *certiorari* y esencialmente arguyeron que erró el Tribunal de Apelaciones al resolver que la Ley Uniforme de

Valores era inaplicable al caso de autos y que, como corolario, las reclamaciones de los recurridos no estaban prescritas. Examinado el recurso, el 28 de octubre de 2016 expedimos el auto.

II

A.

La Ley Uniforme de Valores se aprobó en 1963 ante la ausencia de legislación que reglamentara la industria de valores en Puerto Rico.[5] Se creó con el propósito y objetivo fundamental de proteger tanto al inversionista como al público en general de prácticas fraudulentas en el negocio y distribución de valores. *Olivella Zalduondo v. Triple S*, 187 DPR 625, 636-637 (2013); *Painwebber, Inc. v. First Boston, Inc.*, 136 DPR 541, 543 (1994). Véase, además, el *Informe Conjunto de las Comisiones de lo Jurídico Civil e Industrias y Comercio del Senado de Puerto Rico*, 17 Diario de Sesiones T.4, pág. 1629. La estructura y organización de la Ley Uniforme de Valores coloca de manifiesto el "claro propósito legislativo [de] evitar que las personas dedicadas al negocio de valores incurran en prácticas engañosas y fraudulentas en sus transacciones" que perjudiquen al público inversionista. *Olivella Zalduondo v. Triple S*, supra, pág. 636.

El Art. 401(l) de la Ley Uniforme de Valores define "valor" como

---

[5] Para el trasfondo histórico-jurídico que impulsó la reglamentación de la industria de valores a nivel estatal y federal refiérase a C. Díaz Olivo, *Derecho Mercantil*, 64 Rev. Jur. U.P.R. 861, 864-866 (1995).

cualquier pagaré, acción, acciones en cartera, bono, vale, comprobante de deuda, certificado de interés o participación en algún convenio de distribución de beneficios….**"Valor" no incluirá** ninguna póliza de seguro, o de seguro dotal, **ni contrato de anualidades mediante la cual una compañía de seguros se compromete a pagar <u>una suma determinada de dinero</u>, sea ésta pagadera en suma englobada o periódicamente, durante la vida de la persona o en cualquier otro período especificado.** 10 LPRA sec. 881(l) (Énfasis suplido).

Al redactar la Ley Uniforme de Valores, la Asamblea Legislativa enumeró una serie de prácticas fraudulentas y prohibidas respecto a la compraventa de valores. En lo pertinente al caso de autos, el Artículo 101 dispone que

[s]erá ilegal que cualquier persona, en relación con la oferta, venta o compra de cualquier valor, directa o indirectamente:
(1) [e]mplee cualquier treta, ardid o artificio con el propósito de defraudar;
(2) haga cualquier manifestación falsa sobre un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error…. 10 LPRA sec. 851(1) y (2).

Asimismo, el Artículo 410 de la Ley Uniforme de Valores establece los supuestos en los que existirá responsabilidad civil y los requisitos para instar una causa de acción bajo dicha disposición. *Olivella Zalduondo v. Triple S*, supra, págs. 637-638. En lo pertinente, dispone que

(a) Cualquier persona que:

**(1) Ofrezca o venda un valor en violación a las [secciones] 861(a)[6], 871[7], u 885(b)[8] de este**

---

[6] La Sección 861(a) de la Ley Uniforme de Valores dispone que

[s]erá ilegal que cualquier persona haga negocios como corredor-traficante o agente en Puerto Rico a menos que esté inscrito según las disposiciones de [la Ley Núm. 60 de 18 de junio de 1963, según enmendada, Ley de Valores de Puerto Rico, 10 LPRA secs. 851 *et seq.*] ("Ley Uniforme de

**título,** o a cualquier reglamento u orden conforme a la [sección] 883 de este título la cual requiere la aprobación afirmativa de material de propaganda de venta antes de que el mismo se use, o de cualquier condición impuesta con arreglo a las [secciones] 874(d), 875(g) u 875(h) de este título; o

**(2) Ofrezca o venda un valor por medio de una declaración falsa sobre un hecho material, o mediante omisión de consignar un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error** (desconociendo el comprador la falsedad o la omisión), y que no sostenga el peso de la prueba de que no sabía, y que ejercitando una prudencia razonable, no pudo tener conocimiento, de la falsedad u omisión, será responsable a la persona que le compre el valor; quien podrá entablar una demanda para recobrar el precio pagado por el valor, además de intereses al tipo de interés aplicable a sentencias judiciales... costas y razonables honorarios de abogado menos la cuantía de cualquier ingreso que haya recibido derivado del valor, al ofrecer devolver dicho valor, o por daños y perjuicios, si él ya no es dueño del valor. . ..

. . .

(e) Ninguna persona podrá entablar una demanda civil **de acuerdo con las disposiciones de**

---

Valores"). Artículo 201(a) de la Ley Uniforme de Valores, 10 LPRA sec. 861(a).

[7] La Sección 871 de la Ley Uniforme de Valores dispone que

[s]erá ilegal que cualquier persona ofrezca o venda cualquier valor en Puerto Rico a menos que: (1) Dicho valor haya sido inscrito bajo las disposiciones de [la Ley Uniforme de Valores]; (2) el valor o transacciones te exento bajo las disposiciones de la sec. 882 de [la Ley Uniforme de Valores], o (3) el valor en cuestión es un valor bajo cubierta federal (*federal cover*). Artículo 301 de la Ley Uniforme de Valores, 10 LPRA sec. 871.

[8] La Sección 885(b) de la Ley Uniforme de Valores dispone que

[s]erá ilegal hacer, o inducir que se haga, a cualquier comprador o cliente potencial, cualquier representación inconsistente con el inciso (a) de esta sección.

**esta sección,** después de transcurridos más de dos (2) años de haber sido efectuado el contrato de venta….

. . .

(h) **Los derechos y remedios provistos por [esta Ley] son en adición a cualesquiera derechos o remedios que puedan existir,** pero [esta Ley] no creará una causa de acción no especificada en esta sección o en la sec. 862(e) de este título. 10 LPRA secs. 890(a), (e) y (h) (Énfasis suplido).

Este Tribunal ha interpretado la Ley Uniforme de Valores en dos (2) ocasiones. En *PaineWebber, Inc. v. First Boston, Inc.,* supra, resolvimos que el término prescriptivo aplicable a reclamaciones por incumplimiento de contrato de compraventa bajo la Ley Uniforme de Valores es el término de dos (2) años dispuesto en el Art. 410(e) de dicho estatuto, 10 LPRA sec. 890(e). Recientemente, en *Olivella Zalduondo v. Triple S*, supra, limitamos el alcance de lo resuelto en *PaineWebber, Inc. v. First Boston, Inc.,* supra. Afirmamos que en dicho caso no había controversia de que estábamos ante una transacción de valores llevada a cabo por dos (2) compañías dedicadas a ese negocio y, por lo tanto, **no tuvimos la oportunidad de resolver en qué circunstancias hay que recurrir a la Ley Uniforme de Valores.** *Íd.,* pág. 641. Allí, una Mayoría de este Tribunal similar a la que suscribe esta Opinión -incluyendo a quienes suscriben la Opinión Disidente- estableció con meridiana claridad que **no toda controversia que involucra un valor está sujeta a dicho estatuto, sino que** <u>**los hechos**</u> <u>**particulares de cada controversia deben coincidir con los**</u>

**supuestos estatutarios** porque la Ley Uniforme de Valores regula un tipo específico de relación comercial. *Íd.*, págs. 642, 646-647.

B.

El Comisionado de Instituciones Financieras es quien administra la Ley Uniforme de Valores. 10 LPRA sec. 886. Conforme a la autoridad conferida por la Asamblea Legislativa, la Oficina del Comisionado de Instituciones Financieras (OCIF) promulgó el Reglamento Núm. 6078 del 18 de febrero de 2000, *Reglamento de la Ley Uniforme de Valores* ("Reglamento Núm. 6078"). Allí, enumeró un sinnúmero de conductas que constituyen prácticas deshonestas y anti-éticas en el negocio de valores. En lo pertinente al caso que nos ocupa, el Reglamento Núm. 6078 dispone que

> ARTÍCULO 25. PRÁCTICAS DESHONESTAS Y ANTI-ÉTICAS EN EL NEGOCIO DE VALORES
>
> Sección 25.1 Estándar de negocios y deberes fiduciarios hacia clientes.
>
> Todo corredor-traficante,…, asesor de inversiones,…agente o cualquier otra persona sujeta a las disposiciones de la Ley, **observará los más altos estándares de deberes fiduciarios hacia sus clientes e inversionistas.**
>
> Sección 25.2 Prácticas deshonestas.
>
> **Los actos mencionados en las secciones siguientes** de este artículo, entre otros, **son prácticas contrarias a los estándares [de deberes fiduciarios] establecidos en la sección 25.1,** arriba, y constituyen actuaciones sancionables con la denegación, suspensión o revocación de la inscripción o cualquier otro remedio autorizado por la Ley, este reglamento **o cualquier otra disposición legal aplicable.**

Sección 25.3 En relación a los corredores-traficantes, asesores de inversiones, representantes de asesores de inversiones…, cualquiera de los siguientes actos, entre otros, constituyen prácticas deshonestas o anti-éticas:

. . .

25.3.4 **Recomendar a un cliente la compra, venta** o intercambio **de cualquier valor sin base razonable para creer que tal transacción o recomendación es adecuada ("suitable") para dicho cliente a la luz de la información obtenida del cliente** por el corredor-traficante, asesor de inversiones, representante de asesor de inversiones o el agente, **para verificar los objetivos de inversión, situación económica y necesidades del cliente, cuya información se usara para hacer el análisis sobre transacciones o recomendaciones adecuadas para el cliente ("suitability").**

. . .

ARTÍCULO 28. REQUISITOS DE SUPERVISIÓN PARA CORREDORES-TRAFICANTES

Sección 28.1. Alcance
Este artículo implementa las disposiciones del artículo 204(a)(2)(J) de la Ley y define, en lo que concierne a los corredores-traficantes, los parámetros de supervisión razonable requerida bajo la Ley y cualquier otra disposición legal o reglamentaria aplicable.

Sección 28.2. Sistema de supervisión requerido
**Todo corredor-traficante cumplirá con las disposiciones de la regla 3010 de la NASD o cualquier regla adoptada para** enmendarla, suplementarla o **sustituirla. Los requisitos del sistema de supervisión establecidos en esta sección se entenderán enmendados por cualquier enmienda a la Regla 3010 de la NASD o por cualquier regla adoptada para** enmendarla, suplementarla o **sustituirla.**
Artículos 25.1, 25.2, 25.3.4, 28.1 y 28.2 del Reglamento Núm. 6078 (Énfasis suplido).

En cuanto a las sanciones que acarrea la violación y/o el incurrimiento en conducta prohibida por la Ley Uniforme

de Valores, el Reglamento Núm. 6078 o cualquier otra regla

u orden de la OCIF, el Reglamento dispone claramente que

> [c]ualquier persona que haya violado o esté próxima a dedicarse a cualquier acto o práctica que constituye una violación de cualquier disposición de la [Ley Uniforme de Valores], este reglamento. . . **estará sujeta, <u>entre otras</u>, a los remedios y sanciones provistos en la [Ley Uniforme de Valores]** y a los remedios y sanciones provistos en la Ley Núm. 4 de 11 de octubre de 1985, según enmendada. Artículo 49 del Reglamento Núm. 6078 (Énfasis nuestro).

Por último, el propio Reglamento Núm. 6078 dispone cómo

deberán interpretarse sus disposiciones. En cuanto a este

particular, el mismo dispone *in extenso* que

> Sección 52.1 Este reglamento se interpretará de modo que efectivamente se adelante las metas de supervisar, fiscalizar y reglamentar la industria de valores, **de manera tal que <u>se garantice una mayor protección al inversionista</u>**.
>
> Sección 52.2 **Las reglas emitidas por la "SEC" y la "NASD"** a tenor con las disposiciones de las diferentes leyes de los Estados Unidos sobre valores y asesores de inversiones, **según estas se mencionan y a las que se hacen referencia en este reglamento, <u>incluyendo cualquier regla subsiguientemente adoptada para enmendarlas, sustituirles o suplementarlas, quedan por la presente incorporadas a este reglamento por referencia y se hacen constar como parte del mismo.</u>**[9] Secciones 52.1 y 52.2 del Reglamento Núm. 6078 (Énfasis nuestro).

C.

---

[9] SEC se refiere, por sus siglas en inglés, a la Comisión Federal de Valores y Bolsas ("Securities and Exchange Comission"). NASD se refiere, por sus siglas en inglés, a la Asociación Nacional de Traficantes de Valores ("National Association of Securities Dealers". En el 2007 el Financial Industry Regulatory Authority ("FINRA") sustituyó al NASD.

Una anualidad (*annuity*) es un contrato entre una aseguradora y un individuo en virtud del cual el comprador (*annuitant*) adquiere el derecho a recibir pagos futuros periódicos, ya sea por un tiempo determinado o por el resto de su vida. 8 Jeffrey E. Thomas, *New Appleman on Insurance Law Library Edition*, Sec. [91.01 (1)] (Lexis Nexis). Existen anualidades fijas y anualidades variables, *inter alia*. *Íd.*; 3B C.J.S. Annuities § 1. Por un lado, las anualidades fijas le brindan al beneficiario una cantidad fija de dinero a una tasa predeterminada y no sujeta a contingencias ni a la ocurrencia de un evento futuro. *Íd.*, Sec. [91.01(4)(b)]; 3B C.J.S. Annuities § 1. Por otro lado, las anualidades variables proveen al beneficiario el pago de una suma que puede variar debido a que el dinero aportado es invertido en el mercado de valores y, por ende, su rendimiento está sujeto a las fluctuaciones del mercado. *Íd.*, Sec. [91.01(4)(c)]; 3B C.J.S. Annuities § 1. Respecto a la forma de pago de las anualidades, estas pueden catalogarse como inmediatas o diferidas. Cuando la anualidad es inmediata, el beneficiario recibe el primer pago dentro del primer año de haber comprado la anualidad. A.S. Gassman, C.H. Price y C.J. Denicolo, *Annuity Concepts and Terminology Review for Tax Advisors,* 41 Est. Plan. 31, 32 (2014). *A contrario sensu*, cuando la anualidad es diferida el beneficiario recibe el primer pago luego del primer año de haber adquirido la anualidad. *Íd.*

III

A.

Como cuestión de umbral, previo a examinar si el *Accumulator Plus* que los peticionarios le vendieron al señor Méndez Moll es un "valor", según definido en la Ley Uniforme de Valores, debemos determinar si es una anualidad fija o una anualidad variable. Adelantamos que dicho producto es una anualidad variable y, por ende, constituye un "valor" bajo el Art. 401(l) de la Ley Uniforme de Valores.

i.

El *Accumulator Plus* que el señor Méndez Moll adquirió es una anualidad variable. Así surge tanto del *Accumulator Plus Certificate Summary* como del *Prospectus del Accumulator Plus*.[10] El producto permite al adquirente asignar o distribuir cantidades a varias opciones de inversión variable (*variable investment options*); es decir, subcuentas que, a su vez, son invertidas en porfolios de inversión.[11] El señor Méndez Moll hizo uso de estas opciones de inversión variable y distribuyó su aportación inicial en varias cuentas de inversión.[12] Así las cosas, la aportación del señor Méndez Moll estuvo sujeta a las fluctuaciones del mercado durante la etapa de acumulación. Debido a que el ingreso mensual que este

---

[10] *Íd.*, págs. 1189, 1263, 1290.

[11] *Íd.*

[12] *Íd.*, págs. 1140-1141, 1266-1267, 1285.

recibiría sería determinado en la fecha de maduración (*maturity date*) de la anualidad y dependería del rendimiento del dinero invertido en las opciones de inversión variable, el *Accumulator Plus* en cuestión es una anualidad variable.

Un análisis a la luz de lo resuelto por el Tribunal Supremo federal en *Securities and Exchange Commission v. United Ben Life Ins. Co.*, 387 US 202 (1967), también nos llevaría a concluir que el *Accumulator Plus* en pugna es una anualidad variable. El señor Méndez Moll escogió una opción de pago llamada *Guaranteed Minimum Income Benefit*.[13] Esta opción le permitía *convertir* la anualidad variable en una anualidad fija una vez transcurrieran por lo menos diez (10) años y recibir, desde el momento en el que ejerciera la opción, una suma anual mínima. Ahora bien, ejercida la opción, la suma a desembolsar dependería de: (1) el rendimiento de la inversión inicial durante la fase de acumulación de la anualidad variable y (2) si el señor Méndez Moll realizaba retiros, los cuales debían ser descontados. El señor Méndez Moll nunca ejerció el *Guarantee Minimum Income Benefit*, por lo que el Contrato de Anualidad en cuestión siempre fue uno variable que se encontraba en su fase de acumulación y, como corolario, su función en el mercado era la de una anualidad variable según *Securities and Exchange Commission v. United Ben. Life Ins. Co.*, supra.

---

[13] *Íd.*, pág. 1190.

ii.

Las anualidades variables constituyen un "valor" según definido en el Art. 401(l) de la Ley Uniforme de Valores. En lo pertinente, dicho articulado dispone que el concepto "valor" no incluye los contratos de anualidad en los que una aseguradora "se compromete a pagar <u>una suma determinada de dinero</u>, sea ésta pagadera en suma englobada o periódicamente, durante la vida de la persona o en cualquier otro período especificado." 10 LPRA sec. 881. (Subrayado nuestro). La Asamblea Legislativa aprobó nuestra Ley Uniforme de Valores utilizando como modelo el *Uniform Securities Act* de 1956, estatuto promulgado por el *National Conference of Commissioners on Uniform State Laws* ("NCCUSL") para intentar uniformar la reglamentación de valores a nivel estatal. Véase: Exposición de Motivos de la Ley Núm. 167 del 26 de julio de 1999. La definición de "valor" (*security*) del *Uniform Securities Act* de 1956 incluye las anualidades variables, pero excluye las anualidades fijas.[14] Nuestra Ley Uniforme de Valores se aprobó con ese mismo lenguaje. Por ende, resolvemos que las anualidades variables -incluyendo el *Accumulator Plus* en cuestión- constituyen un "valor" para efectos de esta

---

[14] La Sección 401(m) del *Uniform Securities Act* de 1956 dispone en lo pertinente que "Security" does not include...annuity contract under which an insurance company promises to pay [a fixed sum of] money either in a lump sum or periodically for life or for some other specified period. Si los Estados adoptan el lenguaje con la frase encasillada entre corchetes, las anualidades variables deben entenderse incluidas en la definición de "valor". Véase: *Uniform Securities Act* (1956), según enmendada, pág. 37, comentario oficial de la sección 401(1). *National Conference of Commissioners on Uniform State Laws*, en http://www.nasaa.org/wp-content/uploads/2011/08/UniformSecuritesAct1956withcomments.pdf.

Ley. Una lectura del Artículo 13.450 del Código de Seguros de Puerto Rico, 26 LPRA sec. 1379, nos obliga a concluir lo mismo, a saber: *al presente, en Puerto Rico las anualidades variables son valores regulados por la Ley Uniforme de Valores, mas no seguros regulados por el Código de Seguros.*[15]

B.

El término prescriptivo de dos (2) años dispuesto en el Artículo 410(e) de la Ley Uniforme de Valores aplica única y exclusivamente a las acciones civiles estatuidas en el Artículo 410 de la Ley. El lenguaje de dicho artículo es claro y libre de ambigüedades, por lo que no admite otra interpretación. Este lee de la manera siguiente

> (e) Ninguna persona podrá entablar una demanda civil de acuerdo con las disposiciones **de [la Sección 890 de esta Ley]**, después de transcurridos más de dos (2) años de haber sido efectuado el contrato de venta. 10 LPRA sec. 890(e) (Énfasis suplido).

Por su parte, el Artículo 410 de la Ley Uniforme de Valores (Sección 890) establece una causa de acción civil por la violación a los artículos siguientes: (1) al Artículo 201(a) (sobre vendedor no registrado); (2) al

---

[15] La Sección 1379 del Código de Seguros -intitulada *Ley Uniforme de Valores* dispone que

> Los poderes otorgados al Comisionado de Instituciones Financieras, al amparo de … [la] Ley Uniforme de Valores, en torno a la reglamentación y supervisión de todos los aspectos de las anualidades variables, en tanto y cuanto estas son valores, no serán afectados en forma alguna al entrar en vigor este artículo y las secs. 1366 y 1374 de este título. Estos valores, las anualidades variables, continuaran bajo la cobertura de la "Ley Uniforme de Valores" y los reglamentos aprobados al amparo de dicho estatuto. 26 LPRA sec. 1379 (citas internas omitidas).

Artículo 301 (sobre valor no registrado); (3) al Artículo 405(b) (sobre representaciones ilegales de inscripciones o exenciones); y, (4) al Artículo 410(a)(2) (sobre oferta o venta dolosa de un valor). 10 LPRA sec. 890. La aplicación del término prescriptivo de dos (2) años es limitada. Solo aplica a la acción civil que un inversionista tiene disponible ante los supuestos estatutarios antes citados. **Tan reciente como en el 2013, indicamos claramente que "[s]i la causa de acción no recae sobre alguno de estos [supuestos], no está sujeta al término prescriptivo [de dos (2) años] establecido en el Artículo 410(e)"**. *Olivella Zalduondo v. Triple S*, supra, pág. 647. (Énfasis suplido).

Superado lo anterior, corresponde analizar si la causa de acción dispuesta en el Art. 410 de la Ley Uniforme de Valores es la única causa de acción disponible para los inversionistas agraviados por transacciones de valores o si el derecho les reconoce remedios y acciones adicionales.

C.

Las acciones que brinda la Ley Uniforme de Valores no son las únicas acciones disponibles para un inversionista en la industria de valores. Esta Ley fue aprobada con un fin particular: combatir las prácticas engañosas y fraudulentas en la distribución de valores. Por ende, como ya hemos indicado, no es una ley especial de alcance amplio. *Olivella Zalduondo v. Triple S*, supra, pág. 646. *A contrario sensu*, el enfoque y alcance de la Ley Uniforme

de Valores es estrecho pues las propias disposiciones de la Ley limitan su eficacia y aplicabilidad. *Íd.*, págs. 636, 646-648.

Cabe destacar que la Ley Uniforme de Valores instituyó **una causa de acción civil para violaciones a disposiciones específicas del estatuto**, a saber: (1) al Artículo 201(a) –que quien vendió el valor no está registrado-;(2) al Artículo 301 –que el valor comprado o vendido no está registrado-;(3) al Artículo 405(b) –hacer representaciones ilegales respecto a inscripciones o exenciones-; y, (4) al Artículo 410(a)(2) –ofrecer o vender un valor dolosamente. Véase: 10 LPRA sec. 890(a); *Olivella Zalduondo v. Triple S.*, supra, pág. 647. Esta causa de acción civil es una de las dos (2) creadas por la Ley Uniforme de Valores. 10 LPRA sec. 890(h).

Ahora bien, la Ley Uniforme de Valores establece expresamente que **"[l]os derechos y remedios provistos por [dicha Ley] son en adición a cualesquiera derechos o remedios que puedan existir**, pero este capítulo no creará una causa de acción no especificada en [la Sección 890] o en la sec. 862(e).". 10 LPRA sec. 890(h). Esta cláusula de salvedad aclara que la causa de acción civil, así como las sanciones administrativas y penales que reconoce la Ley Uniforme de Valores, no son los únicos remedios que tiene a su disposición un inversionista en el negocio de valores de Puerto Rico. Sobre este particular, y analizando *Painwebber, Inc. v. First Boston, Inc.*, supra, mediante un

análisis histórico-jurídico, el Prof. Carlos Díaz Olivo, indicó que la Ley Uniforme de Valores "nunca tuvo la intención de convertir en exclusivos los remedios allí concedidos". Véase: C. Díaz Olivo, Derecho Mercantil, 64 Rev. Jur. U.P.R. 861, 864 (1995). Por el contrario, sostuvo que esta Ley fue aprobada para complementar las acciones y remedios que ya existían, en atención a la proliferación y generalización de prácticas fraudulentas y engañosas en la industria de valores. *Íd.*, págs. 864-866.

D.

El recurrido adujo varias causas de acción en su *Demanda Enmendada*. Primeramente, alegó que fue inducido a aceptar un producto financiero que no cumplía con los propósitos que le expresó al señor Gesualdo Pérez. Asimismo, sostuvo que el señor Gesualdo Pérez le hizo falsas representaciones y fue negligente respecto al manejo de los ahorros del recurrido. Tomando como ciertas estas alegaciones, y examinándolas de la forma más favorable para el recurrido, cabe concluir que alegó suficientemente una causa de acción bajo el Artículo 410(a)(2) de la Ley Uniforme de Valores. Sin embargo, conforme al Artículo 410(e) de la Ley Uniforme de Valores, el recurrido tenía dos (2) años a partir de la fecha en la que firmó el Contrato de Anualidad en cuestión para incoar su reclamación. No lo hizo; por lo tanto, su reclamación por compraventa fraudulenta de valores está prescrita.

Sin embargo, la acción civil por prácticas fraudulentas bajo el Artículo 410(a)(2) de la Ley Uniforme de Valores no es la única reclamación alegada en la *Demanda Enmendada*. El recurrido también alegó que el Sr. Gesualdo Pérez le recomendó un producto financiero que no era idóneo o adecuado para este, según sus intereses, necesidades y circunstancias particulares, y que AXA incumplió con su deber de supervisión al permitir la venta.[16] Para entender la naturaleza de las alegaciones del recurrido es necesario examinar algunas disposiciones del Reglamento Núm. 6078 del 18 de febrero de 2000, *Reglamento de la Ley Uniforme de Valores*, el Código de Conducta del NASD (entidad reguladora existente cuando se firmó el Contrato de Anualidad en pugna) y las Reglas de FINRA.

i.

Es menester señalar que la Sección 52.2 del Reglamento Núm. 6078 incorpora por referencia todas las reglas emitidas por el *United States Securities and Exchange Commission* ("SEC") y la NASD, que sean mencionadas y a las que se haga referencia en el Reglamento Núm. 6078, así como cualquier regla que las enmiende, sustituya o suplemente. *Íd.* Ahora bien, el NASD fue sustituido por FINRA en el 2007. Así las cosas, las Reglas de FINRA sustituyeron el Código de Conducta de NASD. Por lo tanto, y en virtud de la Sección 52.2 del Reglamento Núm. 6078, las Reglas de FINRA que sustituyeron

---

[16] Petición de *Certiorari*, Apéndice, págs. 857-860, 862-865.

las Reglas del NASD mencionadas y a las que se hace referencia en el Reglamento Núm. 6078 deben entenderse incorporadas en él por referencia.

En las Secciones 25.3.4 y 28.2 del Reglamento Núm. 6078 se incorporan las Reglas 2111 y 3110 de FINRA. La Sección 25.3.4 cataloga como práctica deshonesta o antiética el recomendar a un cliente la compra de un valor sin base razonable para creer que la transacción o recomendación es adecuada ("suitable") el cliente. Esta disposición es análoga a la Sección 2310 del Código de Conducta de NASD, sustituida por la Regla 2111 de FINRA que requiere que todo vendedor tenga base razonable para creer que la transacción o estrategia financiera que le ha recomendado al cliente es adecuada o idónea ("suitable") para este.[17] La idoneidad de un producto depende del perfil

---

[17] La Sección 2310 del Código de Conducta de NASD disponía que

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer on the basis of facts, if any, disclosed by such customer as to his other security holdings and to his financial situation and needs.

En lo pertinente, la Regla 2111 del *Financial Industry Regulation Authority* (FINRA) dispone que

> 2111. Suitability
> (a) A member or an associated person must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.
> Véase:        Finra        manual,        rule        2111,

del cliente, el cual incluye pero no se limita a su: (1) edad; (2) inversiones previas; (3) situación y necesidades financieras; (4) situación fiscal; (5) metas de inversión; (6) experiencia en inversiones; (7) necesidad de liquidez y (8) tolerancia al riesgo. *Íd.* Por otra parte, la Sección 28.2 obliga a todo corredor-traficante registrado cumplir con la Regla 3010 de NASD, la cual fue sustituida por la Regla 3110 de FINRA. A su vez, la Regla 3110 de FINRA obliga a las entidades dedicadas al negocio de valores a establecer y mantener un sistema de supervisión de agentes y establece los parámetros mínimos con los que debe cumplir el sistema.

ii.

**De un artículo citado por la propia peticionaria** surge que algunas jurisdicciones estatales reconocen una causa de acción civil por incumplimiento de contrato en aquellos casos en los que el vendedor de un producto financiero se compromete contractualmente a cumplir con los estatutos, las reglas y regulaciones de las entidades que regulan la industria de valores. Véase: *Komanoff v. Mabon, Nugent & Co.*, 884 F. Supp. 848, 859-860 (S.D.N.Y. 1995); *Brumm v. McDonald & Co. Securities, Inc.*, 78 Ohio App. 3d 96, 105 (OH 1992); Jason A. Richardson, *Is A Variable Annuity a "Security": Making Sense of Inconsistent State and Federal Securities Statutes*, 14 WTR PIABA B.J. 38, 48-49 (2007). En estos casos, cuando el

---

http://finra.complinet.com/en/display/display.html?rbid=2403&element_id=9859.

vendedor se compromete a cumplir con dichas normas y regulaciones o el comprador ha autorizado determinado curso de negociación conforme a las reglas y costumbres del mercado de valores, las normas y regulaciones que rigen dicha industria se consideran incorporadas por referencia en el contrato de compraventa del producto. *Brumm v. McDonald & Co. Securities, Inc.*, supra, pág. 105 citando *Thomson McKinnon Securities, Inc. v. Clark*, 901 F.2d 1568, 1570 (11th Cir. 1990); Jason A. Richardson, *op. cit.*, n. 40-43.

En Puerto Rico, la Sección 25.1 del Reglamento Núm. 6078 le impone a los corredores-traficantes, a los asesores de inversiones y a los agentes de estos, la obligación de observar "los más altos estándares de deberes fiduciarios hacia sus clientes". Esta sección pone de manifiesto el deber de *fair dealing* en virtud del cual las personas y entidades dedicadas al negocio de valores en Puerto Rico deben actuar íntegramente, de buena fe y consistente a los mejores intereses del cliente. Uno de los aspectos centrales de estos deberes fiduciarios es el recomendar productos que sean idóneos o adecuados ("suitable") para el cliente conforme a sus circunstancias y objetivos. Véase: Secciones 25.2 y 25.3.4 del Reglamento Núm. 6078.

Así las cosas, existe una causa de acción civil por Incumplimiento de Contrato en casos en los que un vendedor de valores viola algún deber fiduciario, regla o

regulación de las entidades que regulan la industria de valores que se ha comprometido a observar, como lo es la OCIF en Puerto Rico. Esta acción civil no es una causa de acción implícita bajo las Reglas 2310 y 3010 de NASD, las Reglas 2111 y 3110 de FINRA ni las Secciones 25.3.4 y 28.2 del Reglamento Núm. 6078. *A contrario sensu*, esta reclamación surge del incumplimiento de una obligación contractual.

La causa de acción hoy reconocida es compatible con aquella instituida en el Artículo 410 de la Ley Uniforme de Valores por varias razones. Primero, es consistente con los sucesos históricos que motivaron la incursión legislativa en la industria de valores. Particularmente, con el hecho de que el derecho común desarrolló causas de acciones que están disponibles para inversionistas desde antes de que se legislara al efecto. Segundo, es cónsono con el lenguaje del Artículo 410(h) de la Ley Uniforme de Valores que **contempla la existencia previa de otros derechos y remedios** para inversionistas en el negocio de valores. Tercero, adelanta la política pública del Estado de proteger a los inversionistas de prácticas inadecuadas en dicha industria ya que, además de sanciones administrativas y penales, las entidades dedicadas a la compraventa de valores y sus agentes estarían sujetos a responder civilmente por el incumplimiento y la violación de las mejores prácticas de su industria, las cuales se comprometieron a cumplir.[18]

---

[18] Véase: Artículo 409 de la Ley Uniforme de Valores, *supra*, 10 LPRA sec. 889; Artículo 49 del Reglamento Núm. 6078 del 18 de febrero de

E.

Las alegaciones de la *Demanda Enmendada* del recurrido exponen una reclamación sobre incumplimiento de contrato. Este alegó, *inter alia*, que:

24. Conforme dejase claro desde el principio el señor Méndez Moll, su objetivo y finalidad de invertir principalmente en productos de renta fija, era evitar los riesgos asociados a las inversiones...vinculadas o que dependan de las fluctuaciones del mercado…. Sin embargo y **sin importar los requerimientos y necesidades del demandante, el medio de inversión seleccionado por AXA y [el señor Gesualdo Pérez], siempre estuvo atado a las fluctuaciones del mercado y no provee la estabilidad, ni remesas fijas, todo ello contrario a lo acordado al realizarse la inversión con los demandados.**

25. […] El principal, según invertido por los demandados, se ha visto reducido. . . como consecuencia de las recomendaciones y estrategias negligentes y erráticas diseñadas y puestas en vigor por los demandados, **las cuales eran contrarias a las mejores prácticas financieras reconocidas en la industria para una persona de la edad y las necesidades del demandante….**

28. Los aquí demandados invirtieron los ahorros producto del trabajo de toda una vida del demandante en vehículos de inversión o anualidades, que estaban sujetos a la volatilidad del mercado, **esto a pesar de que conocían de los requerimientos, objetivos y necesidades del demandante.**

29. Los demandados, AXA y el Sr. Gesualdo Pérez, **no ejercieron la diligencia que debieron prestar en el cumplimiento de sus obligaciones con el demandante y que correspondía a las circunstancias particulares de los demandantes, sus edades y condiciones.**

Asumiendo que las alegaciones de la *Demanda Enmendada* son ciertas -como debemos hacer al evaluar una Moción de Desestimación bajo la Regla 10.2(5) de Procedimiento Civil,

---

2000, *Reglamento de la Ley Uniforme de Valores;* Artículo 20 de la Ley Núm. 4 de 11 de octubre de 1985, según enmendada, *Ley de la Oficina del Comisionado de Instituciones Financieras*, 7 LPRA sec. 2020.

*supra-* y analizándolas de la forma más favorable para el recurrido, resulta forzoso concluir que -además de la reclamación al amparo del Artículo 410(a)(2) de la Ley Uniforme de Valores- este expuso suficientemente una reclamación de incumplimiento de contrato. Consecuentemente, únicamente procede desestimar la reclamación por compraventa fraudulenta bajo el Artículo 410(a)(2) de la Ley Uniforme de Valores.

## F.

Dadas las particularidades del caso, no reconocer esta causa de acción y validar el resultado al que llegarían los compañeros de este Tribunal que suscriben la Opinión Disidente, fomentaría y, en cierta medida, perpetuaría prácticas que la propia industria de valores cataloga deshonestas y antiéticas. Dado a la precariedad de los sistemas y programas de retiro, son cada vez más las personas que optan por colocar sus ahorros en productos financieros como lo son las anualidades. Particularmente, las anualidades variables no son un producto idóneo para todo inversionista. Sin embargo, muchos corredores han recomendado y vendido este producto indiscriminadamente por años.[19] En respuesta al aumento en

---

[19] En el año 2005 la *North American Securities Administrators Association* (NASAA) catalogó la compraventa de anualidades variables como la novena peor amenaza para inversionistas. Igualmente, el Departamento de Corporaciones de California clasificó varias estafas relacionadas con productos de inversiones y colocó la compraventa de anualidades variables en el segundo lugar. Véase: Jason A. Richardson, *Is A Variable Annuity a "Security": Making Sense of Inconsistent State and Federal Securities Statutes,* 14 WTR PIABA B.J. 38 (2007).

la venta y popularidad de las anualidades variables, durante los años 1996, 1999 y 2000 la NASD emitió varias circulares en las que advirtió a sus miembros que la venta de anualidades variables estaba sujeta a los requisitos de idoneidad esbozados en la Regla 2310 del Código de Conducta del NASD y a las normas de supervisión contenidas en la Regla 3010 del Código de Conducta del NASD, incorporadas en Puerto Rico por virtud de los Artículos 25.3.4, 28.2 y 52.2 del Reglamento Núm. 6078.[20]

Es menester señalar que la Ley Uniforme de Valores requiere que todo corredor-traficante de valores que quiera inscribirse en la OCIF como tal sea miembro del NASD, o su sucesora; en este caso, FINRA. 10 LPRA sec. 862(g). Como cuestión de hecho: (1) del *Prospectus* que AXA le entregó al recurrido surge que AXA está registrada en el SEC y era miembro de NASD; (2) el señor Gesualdo Pérez declaró que NASD le expidió su *Serie 6* y que actualmente las reglas de FINRA lo obligan a tomar cursos de educación continua. Por ende, los peticionarios están obligados a observar las reglas y regulaciones de estas entidades, así como las de la OCIF.

Del artículo *Is A Variable Annuity a "Security": Making Sense of Inconsistent State and Federal Securities Statutes* **citado por la propia peticionaria** surge que, por sus características, las anualidades variables son idóneas

---

[20] Véase: NASD Notice to Members 96-86, 99-35 & 00-44. De estas circulares surge que la NASD tomó acciones disciplinarias contra miembros que incumplieron con las normas de idoneidad y supervisión relacionadas a la venta de anualidades variables.

para un grupo pequeño de personas. Véase: Jason A. Richardson, *op. cit.*, p. 41. A continuación, algunas de las cualidades de estos contratos. Las anualidades variables diferidas —como la que AXA le vendió al recurrido en el caso de autos— son productos de inversión a largo plazo. El dinero aportado al producto es invertido en el mercado de valores, por lo que la inversión está sujeta a las fluctuaciones del mercado durante la denominada fase de acumulación. Generalmente, quien adquiere este tipo de producto no empieza a recibir pagos hasta que la inversión madure; es decir, hasta que culmine la fase de acumulación y comience la fase de desembolso. Lo anterior puede significar años. Claro está, el inversionista que así lo desee tiene la opción de retirar dinero de las distintas subcuentas en las que se invierte el dinero aportado y hasta programar retiros sistemáticos. Sin embargo, estos retiros conllevan el pago de cargos por redención y la reducción del beneficio en caso de muerte, una de las características principales del producto. Según el autor Richardson, las características principales de las anualidades variables tales como los cargos relativamente altos, la falta de liquidez que causan y las penalidades por redención, son algunas de las razones por las cuales estos productos generalmente son idóneos para inversionistas menores de 40 años. *Íd.*, pág. 41. Véase además: Office of Compliance Inspections and Examinations of the United States Securities and Exchange Commisssion,

"*Joint SEC/NASD Report On Examination Findings Regarding Broker-Dealer Sales of Variable Insurance Products*", junio del 2004, pág. 2, https://www.sec.gov/news/studies/secnasdvip.pdf (última visita el 27 de noviembre de 2018).

No existe controversia respecto a que el recurrido interesaba una anualidad fija, necesitaba liquidez y no deseaba arriesgar su inversión inicial. Por un lado, así surge de la *Demanda Enmendada* y del Alegato del recurrido. Por otro lado, el señor Gesualdo Pérez -representante de AXA que le vendió al señor Méndez Moll la anualidad variable en cuestión- declaró en la Vista Evidenciaria que el recurrido: (1) le solicitó una anualidad fija; (2) no quería perder su contribución inicial de seiscientos mil dólares ($600,000.00) y (3) deseaba recibir seis mil dólares ($6,000.00) mensuales. No empece lo anterior, el señor Gesualdo Pérez le recomendó al recurrido la anualidad variable diferida en cuestión y le entregó una proyección.[21] Esta es muy reveladora si consideramos las características principales de las anualidades variables diferidas. A la fecha en que se hizo la proyección, el recurrido tenía **62 años de edad.** Por lo tanto, ese fue el punto de partida de la proyección. Según surge del *Annuity Contract*, la fecha de maduración del producto era el 24 de enero de 2037.[22] A esta fecha, el recurrido tendría 95 años

---

[21] Petición de *Certiorari*, Apéndice, págs. 1255-1256.

[22] *Íd.*, pág. 1138.

de edad. La proyección tomaba en cuenta que el recurrido retiraría setenta y dos mil dólares ($72,000.00) anuales. Dicha cantidad es más del diez por ciento (10%) del valor de la cuenta; por lo tanto, cada retiro estaría sujeto al pago de cargos por redención, salvo que el rendimiento de la inversión fuera lo suficientemente alto como para que el retiro anual constituyera menos del diez por ciento (10%) del valor de la cuenta.[23]

Según el propio señor Gesualdo Pérez, el recurrido interesaba una anualidad fija; sin embargo, le vendió una anualidad variable con la opción de *convertirla* a una anualidad fija al cabo del tiempo. Es decir, el recurrido tenía la opción de *convertir* la anualidad variable en una fija transcurridos diez (10) años debido a que escogió el *Guaranteed Minimum Income Benefit*. Además de que ello no convierte el *Accumulator Plus* en una anualidad fija *per se* cabe resaltar que mientras no transcurrieran los diez años y el recurrido no ejerciera la opción de convertir el *Accumulator Plus* en una anualidad fija, la inversión inicial del recurrido estaría sometida a los riesgos de las fluctuaciones del mercado. Ello choca con el deseo y objetivo inequívoco del recurrido -según expresada por el propio señor Gesualdo Pérez- de recibir ingresos mensuales fijos sin arriesgar su inversión inicial. **A fin de cuentas, el señor Méndez Moll no recibió el pago fijo de seis mil dólares ($6,000.00) mensuales por el tiempo que**

---

[23] *Íd.*, pág. 1148.

**deseaba, su contribución inicial de seiscientos mil dólares ($600,000.00) no estuvo asegurada, no obtuvo beneficio alguno del producto adquirido y probablemente culminó pagando miles de dólares por concepto de cargos de manejo, administración y redención.**

Ciertamente, aun reconociéndole al señor Méndez Moll una reclamación por incumplimiento de contrato, este tiene que probar los elementos de la causa de acción en su día. Sin embargo, hizo alegaciones suficientes en la Demanda en cuanto a que: (1) el señor Gesualdo Pérez incumplió con su obligación de recomendar productos que fueran idóneos para él según sus propósitos, necesidades y circunstancias personales; y, que (2) AXA incumplió con su deber de supervisar la transacción en controversia. Por esta razón, consideramos que no se justifica una desestimación en esta etapa de los procedimientos en virtud de la Regla 10.2(5) de Procedimiento Civil, *supra*.[24]

Resulta difícil ignorar los hechos específicos del caso de autos y el sentido de impunidad con el que AXA y el señor Gesualdo Pérez esbozan sus planteamientos. Particularmente, llama la atención que el señor Gesualdo Pérez le recomendó al señor Méndez Moll una anualidad variable -con los visos de inadecuacidad discutidos-, reconoció que el señor Méndez Moll interesaba una anualidad fija y luego sostuvo que la intención de este

---

[24] *Íd.*, págs. 857-865.

era irrelevante al determinar bajo qué disposiciones legales se regía la controversia de autos.

G.

Por último, hacemos un llamado a la Asamblea Legislativa para que estudie y evalúe la aplicabilidad de la Ley Uniforme de Valores a los contratos de anualidades variables. En *S.E.C. v. Variable Annuity Life Insurance Co. Of America,* supra, el Tribunal Supremo federal resolvió que las anualidades variables constituyen un "valor", según dicho término fue definido en el *Securities Act* de 1933. Ahora bien, el mencionado estatuto federal no ocupa el campo. Todos los estados han adoptado legislación sobre la materia. De hecho, el NCCUSL intentó uniformar la reglamentación de valores a nivel estatal mediante la promulgación del *Uniform Securities Act* de 1956. La definición de "valor" del *Uniform Securities Act* de 1956 incluye los contratos de anualidades variables.[25] Precisamente, nuestra Ley Uniforme de Valores fue aprobada utilizando como modelo el *Uniform Securities Act* de 1956. Sin embargo, esta versión fue revisada y enmendada en varias ocasiones. La versión más reciente fue aprobada en el año 2002.[26] **En esta ocasión, las anualidades variables**

---

[25] *Uniform Securities Act* (1956), según enmendada, pág. 37, comentario oficial de la sección 401(1). National Conference of Commissioners on Uniform State Laws, en http://www.nasaa.org/wp-content/uploads/2011/08/UniformSecuritesAct1956withcomments.pdf.

[26] *Uniform Securities Act* (2002), según enmendada en 2005. *National Conference of Commissioners on Uniform State Laws*, en http://www.uniformlaws.org/shared/docs/securities/Securities_final_05_2017jan19.pdf.

**fueron excluidas del concepto "valor".**[27] Los estados han adoptado diversas versiones e inclusive algunos han optado por adoptar su propia versión. Ahora bien, de un estudio realizado en Hawaii en el año 2006 surge que los estatutos de valores de la mayoría de los estados no consideran los contratos de anualidades variables como un "valor".[28] Sería útil que la Asamblea Legislativa estudiara por qué cambió la postura del NCCUSL y qué relación, si alguna, guarda la catalogación de una anualidad variable como valor con la proliferación de prácticas inadecuadas relacionadas a este producto.

IV

Por los fundamentos antes expuestos, procede que se confirme la Sentencia recurrida.

Mildred G. Pabón Charneco
Jueza Asociada

---

[27] *Íd.*, pág. 15, comentario oficial de la sección 102(28).

[28] Dean Sugano, *Variable Annuity Contracts Under State Statutes Relating to Securities and to Insurance*, pág. 26, Legislative Reference Bureau, December 2006, en http://lrbhawaii.org/reports/legrpts/lrb/rpts06/annuity.pdf.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

José Méndez Moll, Edith Román
Hernández

     Recurrido

       v.

                       CC-2016-0494

AXA Equitable Life Insurance Co.;
Luis A. Gesualdo Pérez;
Aseguradoras A, B y C

     Peticionario

Opinión Disidente emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se unió el Juez Asociado señor FELIBERTI CINTRÓN.

En San Juan, Puerto Rico, a 31 de mayo de 2019.

En PaineWebber, Inc. v. First Boston, Inc., 136 DPR 541(1994), nos enfrentamos a una controversia similar y resolvimos que la Ley Uniforme de Valores, según enmendada, 10 LPRA sec. 851 et seq., es una ley especial y que el periodo prescriptivo aplicable a controversias cubiertas bajo esta ley sería el allí dispuesto. Como explico a continuación, resolver lo contrario deja inoperante el propósito de la Ley de Valores en Puerto Rico y contradice el precedente.

I

En noviembre de 2003, el Sr. José Méndez Moll comenzó a buscar información sobre herramientas de inversión con el propósito de prepararse para su

retiro. Por esto, contactó al Sr. Luis A. Gesualdo Pérez, agente de seguros y representante de <u>AXA Equitable Life Insurance Company</u> (AXA), con quien sostuvo una serie de reuniones y conversaciones entre noviembre de 2003 y enero de 2004. El señor Méndez Moll le dejó saber al señor Gesualdo Pérez que estaba interesado en herramientas de inversión que le produjeran una anualidad fija, la suma de $6,000 mensuales y que aseguraran su contribución inicial, que fue de $600,000. Por ello, el señor Gesualdo Pérez le recomendó el producto <u>Equitable Accumulator Plus</u> y le presentó una serie de proyecciones que cumplían con las especificaciones requeridas. Luego de varias conversaciones, el señor Méndez Moll escogió el <u>Accumulator Plus</u>, y el 21 de enero de 2004, entregó a AXA la contribución inicial de $600,000 y, además, escogió dónde quería invertir su dinero. Entonces, el señor Méndez Moll recibió $18,000 trimestrales hasta septiembre de 2009, equivalente a $6,000 mensuales. Esa es la cantidad de dinero que había indicado que deseaba recibir. Sin embargo, a partir de 2009 comenzó a recibir alrededor de $9,000 trimestrales, equivalente a $3,000 mensuales.

Ante esto, el señor Méndez Moll intentó comunicarse con el señor Gesualdo Pérez. Sin embargo, su gestión no tuvo éxito. Entonces, el 13 de febrero de 2013, el señor Méndez Moll demandó a AXA y al señor Gesualdo Pérez, por daños y perjuicios, así como por negligencia en el cumplimiento de las obligaciones contractuales. Además, la demanda incluía como tercera causa de acción una reclamación de la Sra. Edith Román Hernández, esposa del señor Méndez Moll, por los daños y perjuicios que ella sufrió alegadamente como consecuencia del deterioro de

salud de su esposo y la reducción de ingreso producto de la supuesta negligencia de los demandados en el cumplimiento de sus obligaciones.

Como respuesta, AXA presentó una moción de desestimación, a la que se unió el señor Gesualdo Pérez, en la que alegó que la causa de acción estaba prescrita, ya que las reclamaciones del señor Méndez Moll estaban sujetas a la Ley Uniforme de Valores, supra, y no a las disposiciones del Código Civil sobre contratos. El señor Méndez Moll se opuso y alegó que la Ley Uniforme de Valores no aplica, ya que la anualidad en controversia no cae dentro de la definición de valor que provee esa ley.

El 5 de noviembre de 2013, el Tribunal de Primera Instancia emitió una sentencia parcial en la que desestimó la causa de acción por los daños y perjuicios sufridos por la señora Román Hernández. Además, ordenó la celebración de una vista evidenciaria para poder adjudicar si el objeto del negocio fue un valor. Así podría decidir si la causa de acción estaba prescrita. En reconsideración, el foro primario dejó sin efecto su sentencia y dio la oportunidad a la señora Román Hernández de enmendar las alegaciones de la demanda para hacer constar el momento en el que había advenido en conocimiento de los daños causados por AXA y el señor Méndez Moll. Sin embargo, enfatizó que esto no significa que la causa de acción estuviera prescrita.

En la vista evidenciaria se estipuló que el 25 de junio de 2012 la señora Román Hernández advino en

conocimiento de los daños alegados. Además, las partes aceptaron que la causa de acción de la señora Román Hernández es contingente a que la de su esposo, el señor Méndez Moll, no esté prescrita. Durante la vista testificó el Sr. Sidney James Smith, quien trabajó para AXA por cerca de cuarenta años y colaboró en la distribución del Accumulator Plus entre 2001 y 2008. El señor Smith no tenía conocimiento de la transacción aquí en controversia. En su testimonio, explicó que las anualidades variables son productos de inversión que no garantizan el valor que van a tener al comienzo del pago de la anualidad, pues ese valor depende de las fluctuaciones del mercado. Además, definió el Accumulator Plus como una anualidad variable que permite al comprador colocar sus contribuciones en fondos de inversión. Sin embargo, señaló que este producto tiene la particularidad de permitir que el adquiriente de la anualidad escoja el Guaranteed Minimum Income Benefit (garantía de ingreso mínimo) lo que permite convertir el valor de la cuenta en una anualidad fija, al momento en que se comience a pagar. También testificó el Sr. Reinaldo Ledesma, Branch Manager de AXA Advisors, LLC, quien declaró que comenzó a trabajar con AXA en 2005, por lo que no conocía el producto Accumulator Plus que se vendía antes y que adquirió el señor Méndez Moll. El señor Ledesma declaró que el Accumulator Plus que él conoce es un contrato de anualidad variable y que nunca lo conoció como una combinación de anualidad fija y variable.

Durante la vista evidenciaria también declaró el señor Gesualdo Pérez. En su testimonio, este indicó que el Accumulator Plus es una anualidad variable. Asimismo, indicó que el señor Méndez Moll solicitó una anualidad fija. Además, declaró que le dio toda la información sobre el producto al señor Méndez Moll y le entregó unas proyecciones sobre cómo sería el rendimiento del producto, al tomar en cuenta la contribución inicial de $600,000 que el señor Méndez Moll no quería perder y los $6,000 mensuales que quería recibir. Empero, admitió que lo que ocurrió con la cuenta del señor Méndez Moll es distinto a lo que surgía de las proyecciones iniciales.

Por último, declaró el señor Méndez Moll. Este indicó que el señor Gesualdo Pérez le enseñó las proyecciones y que, además, le explicó que podía recibir más de los $600,000 pero nunca menos de esa cantidad. El señor Méndez Moll también indicó que después de depositar el dinero se dio cuenta de que el producto no funcionaba como él deseaba. Sin embargo, declaró que el producto funcionó bien hasta 2005 cuando comenzaron las pérdidas.

Además, las partes presentaron en el Tribunal de Primera Instancia los documentos siguientes: 1) el Prospecto del Accumulator Plus; 2) el Annuity Contract (contrato); 3) el Certificiate Summary (resumen); 4) las proyecciones hipotéticas, y la solicitud del Accumulator Plus.

Finalmente, el Tribunal de Primera Instancia denegó las mociones de desestimación. Determinó que el producto en controversia es una anualidad fija, ya que el señor Méndez Moll recibiría una cantidad mensual fija. Dijo, además, que el señor Méndez Moll adquirió el producto con la intención de adquirir una anualidad fija, la cual no se considera un valor, según la Ley Uniforme de Valores. Por esto, el tribunal concluyó que este caso trata de un incumplimiento de contrato regulado por el Código Civil, el cual establece un periodo prescriptivo de quince años que aún no ha transcurrido. Art. 1864 del Código Civil, 31 LPRA sec. 5294.

Inconformes con lo resuelto, AXA y el señor Gesualdo Pérez acudieron mediante <u>certiorari</u> al Tribunal de Apelaciones. Insistieron en que el producto que el señor Méndez Moll compró es una anualidad variable regulada por la Ley Uniforme de Valores. El foro apelativo intermedio confirmó al foro primario al coincidir en que en este caso el producto en controversia era una anualidad fija.

Ante este resultado, AXA y el señor Gesualdo Pérez acudieron ante nos y, en síntesis, plantearon que el foro apelativo intermedio erró al determinar que la Ley Uniforme de Valores no aplica en este caso y, por lo tanto, se equivocó también al determinar que las causas de acción del señor Méndez Moll y su esposa no estaban prescritas.

II

A. Anualidades

Una anualidad es un contrato a través del cual se adquiere el derecho a recibir pagos periódicos por la vida del beneficiario (*annuitant)* o por un periodo determinado de tiempo. 8 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition, Sec. [91.01 (1)] (Lexis Nexis). Las anualidades pueden ser fijas o variables. Íd. Las anualidades fijas le proveen al beneficiario una cantidad predeterminada, que no es contingente a ninguna ocurrencia. Íd., Sec. [91.01(4)(b)]. Por su parte, en las anualidades variables las primas que se pagan son invertidas en acciones y, por lo tanto, el pago al beneficiario va a estar condicionado al rendimiento alcanzado cuando comience el pago de la anualidad. Íd., Sec. [91.01(4)(c)].

Por otro lado, el pago de las anualidades puede ser inmediato o diferido. Si es inmediato, el beneficiario recibe el primer pago de la anualidad dentro del año de haber adquirido el contrato. A.S. Gassman, C.H. Price y C.J. Denicolo, Annuity Concepts and Terminology Review for Tax Advisors, 41 Est. Plan. 31, 32 (2014). En cambio, si el pago de la anualidad es diferido el beneficiario recibe el primer pago luego del primer año de haber adquirido el contrato. Íd.

Hay ocasiones en que es difícil detectar si un contrato de anualidad diferida es fijo o variable. Para ilustrarnos, conviene acudir a la decisión del Tribunal Supremo de Estados Unidos en Securities and Exchange Commission v. United Ben. Life Ins. Co., 387 US 202 (1967), donde se atendió ese punto. El caso trata de una anualidad llamada Flexible Fund, en la cual se pagaban unas primas fijas mensuales por cierta cantidad de

tiempo. La mayor parte de la cantidad pagada en primas se invertía en acciones. Sin embargo, se le garantizaba al adquiriente que al comenzar a recibir el dinero se le pagaría un porcentaje de las primas ya satisfechas. Además, el beneficiario contaba con diferentes opciones para escoger cómo se iba a pagar la anualidad. Entre ellas se encontraba convertir el valor de la cuenta en una anualidad fija que se pagaría de por vida al beneficiario. El Tribunal Supremo federal indicó que para determinar si se trata de un contrato de anualidad diferido fijo o variable había que auscultar "la función que el comercio le da al instrumento bajo los términos de la oferta, el plan de distribución y los incentivos económicos incluidos en el prospecto". (Traducción nuestra.) Íd., pág. 21. ("*what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.*") Véase también, Thomas, supra, Sec. [91.01 (6)(b)]. Así pues, para determinar si la anualidad diferida era fija o variable, el más alto foro federal dividió el contrato en dos fases: 1) la acumulación antes de que comience el pago de la anualidad y 2) el vencimiento, una vez comienza el pago de la anualidad. Hecho esto, el Tribunal concluyó que la primera fase del contrato de inversión se comporta como una anualidad variable, ya que el valor que se acumula depende del rendimiento de las inversiones, aunque se garantice al adquiriente que se le enviará una cantidad fija al comenzar a recibir los pagos de la anualidad. Por eso, el Tribunal resolvió que el contrato de anualidad en controversia era un valor cubierto por la legislación federal, ya que se encontraba en la etapa de acumulación.

En nuestro caso, surge de los documentos del expediente que la anualidad es diferida y funciona como una combinación de fija con variable. Accumulator Plus Certificate Summary, Petición de certiorari, Apéndice, Exhibit IX, pág. 1263; Prospectus de Accumulator Plus, Petición del certiorari, Apéndice, Exhibit XI, pág. 1290. La persona que la adquiere tiene diferentes alternativas para invertir su dinero. El señor Méndez Moll eligió el Variable Investment Option (Opción de inversión variable), la cual le permitió escoger en qué desea invertir su dinero. Accumulator Plus Certificate Summary, supra, págs. 1266- 1267; Annuity Contract, Petición de certiorari, Apéndice, Exhibit I, págs. 1140-1141; Enrollment Form and Application for Individual Contract of Equitable Acummulator Plus, Petición de certiorari, Apéndice, Exhibit X pág. 1285. Esa opción no garantiza el dinero invertido y lo que recibirá la persona al momento del vencimiento de la anualidad dependerá del rendimiento del dinero invertido. Es por esto que se considera que es anualidad variable. Prospectus del Accumulator Plus, supra, pág. 1305. Asimismo, el señor Méndez Moll escogió en la solicitud la opción Garantía de ingreso mínima. Esta garantizaba un pago mínimo anual al vencimiento de la anualidad. Sin embargo, esta cantidad se determina al momento en que comienzan los pagos de la anualidad. Es en ese momento que se convierte en una anualidad fija. Enrollment Form and Application for Individual Contract of Equitable Acummulator Plus, supra, pág. 1282; Prospectus del Accumulator Plus, supra, pág. 1313.

El Accumulator Plus también permite que se hagan retiros de manera sistemática, previo a la fecha de vencimiento de la anualidad. Prospectus del Accumulator Plus, supra, pág. 1319. De la evidencia presentada surge que el señor Méndez Moll llenó dos

solicitudes para realizar esta clase de retiro. Véanse Solicitud de retiro efectivo de 1 de marzo de 2004, Petición de certiorari, Apéndice, Exhibit XII págs. 1544-1549; Formulario de retiro efectivo de 5 de agosto de 2009, Pétición de certiorari, Apéndice, Exhibit XIII, págs. 1550-1560. De hecho, de los estados de cuenta anuales que se le enviaron al Sr. Méndez Moll surgen retiros anuales de $72,000 entre el 21 de enero de 2005 y el 21 de enero de 2009. Estos retiros equivalen a $6,000 mensuales. Resúmenes anuales de cuenta años 2005 al 2009, Petición de Certiorari, Apéndice, Exhibit I, págs. 1203-1220. Asimismo, surge un retiro de $54,000 anuales entre el 21 de enero de 2009 y el 21 de enero de 2010. Resúmenes anuales de cuenta años 2009 al 2010, supra, págs. 1222-1225. Además, entre el 21 de enero de 2010 y el 21 de enero de 2013, recibió $36,000 anuales. Resúmenes anuales de cuenta años 2010 al 2013, supra, págs. 1226-1236. Estos estados de cuenta demuestran también cómo fue disminuyendo el dinero en la cuenta del señor Méndez Moll. Como podemos ver, el dinero que recibía mensualmente el señor Méndez Moll eran retiros sistemáticos, que el contrato permitía hacer antes de que la anualidad venciera y se comenzara a pagar.

Al igual que en Securities and Exchange Commission v. United Ben. Life Ins. Co., supra, la anualidad aquí en controversia es una mezcla de anualidad fija con variable, que se encontraba en la fase de acumulación, pues el valor de la cuenta depende de las fluctuaciones del mercado. No es hasta que venza la anualidad que se determina su valor. Por lo tanto, podemos concluir que la función de este instrumento en el mercado es el de una anualidad variable. El hecho de que el señor Méndez Moll haya escogido la Garantía de ingreso mínima no convierte la anualidad en fija, ya que su monto va a depender

del valor de la cuenta al momento en que comience el pago. Es a partir del momento en que se determine la cantidad que se va a pagar, que la anualidad se comienza a comportar como fija. Por otro lado, los pagos mensuales que recibió el señor Méndez Moll tampoco pueden considerarse decisivos para determinar si la anualidad es fija debido a que son retiros hechos antes del vencimiento de la anualidad.

Concluir que este contrato es una anualidad fija significaría ignorar la incertidumbre sobre el valor final de la anualidad al momento de su vencimiento, elemento medular de la anualidad variable. En el producto Accumulator Plus, la suma a recibir por la anualidad depende del rendimiento de la inversión. Incluso, no se asegura el principal. Además, el beneficiario conocería el valor total al momento del vencimiento de la anualidad y no antes. La única certeza al momento de la adquisición era el dinero que iba a recibir el beneficiario por los retiros que hizo y que si seleccionaba el beneficio de Garantía de ingreso mínima tendría asegurado un ingreso mínimo cuando venciera la inversión. Sin embargo, el beneficiario no sabe qué cantidad va a recibir si selecciona esta opción, ya que la cantidad se determinará al comenzar a recibir los pagos que corresponden a la anualidad.

La anualidad no se puede clasificar como variable o fija, a base de la intención del comprador. La clasificación de una anualidad depende del contrato. Al momento de iniciarse la causa de acción, el Accumulator Plus se encontraba en la etapa de acumulación y su valor final, al comenzar el pago de la anualidad, dependería de las fluctuaciones del mercado. Por ello, concluimos que estamos ante una anualidad variable.

B. Ley Uniforme de Valores

La Ley Uniforme de Valores, supra, se aprobó en 1963 para reglamentar en Puerto Rico la industria de valores y evitar el fraude. Las Comisiones de lo Jurídico Civil e Industrial y Comercio del Senado de Puerto Rico prepararon un informe conjunto en el que indicaron que

> [el] objetivo fundamental del proyecto bajo consideración es el proteger a los inversionistas y al público general mediante la exigencia de ciertos requisitos a las personas que se dediquen al negocio de valores y a la creación de un organismo gubernamental con poderes de supervisión y fiscalización sobre diversas fases del negocio, a los fines de evitar que se incurra en prácticas fraudulentas en el curso del mismo. 4 Diario de Sesiones 1629 (1963). Véanse, además, Olivella Zalduondo v. Triple S, 187 DPR 625, 635 (2013); PaineWebber, Inc. v. First Boston, Inc., 136 DPR 541, 544 (1994).

Así, la ley cataloga conductas como fraudulentas y engañosas y proscribe una serie de prácticas. La ley indica en lo pertinente:

Sec. 851. Compras y ventas

> Será ilegal que cualquier persona, en relación con la oferta, venta o compra de cualquier valor, directa o indirectamente:
>
> (1) Emplee cualquier treta, ardid o artificio con el propósito de defraudar;
>
> (2) haga cualquier manifestación falsa sobre un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error.
>
> (3) ...
>
> Art. 101(1) y (2) de la Ley Uniforme de Valores, 10 LPRA sec. 851(1) y (2).

Asimismo, el Art. 102 (a)(1) y (2) de la Ley Uniforme de Valores, 10 LPRA sec. 852 (a)(1) y (2), cataloga de ilegales las consultas fraudulentas y engañosas.

La ley, también, autoriza una causa de acción civil contra cualquier persona que en el mercado de valores:

> (2) ofrezca o venda un valor por medio de una declaración falsa sobre un hecho material, o mediante omisión de consignar un hecho material necesario para evitar que las declaraciones formuladas, a la luz de las circunstancias bajo las cuales se hicieron, conduzcan a error (desconociendo el comprador la falsedad o la omisión), y que no sostenga el peso de la prueba de que no sabía, y que ejercitando una prudencia razonable, no pudo tener conocimiento, de la falsedad u omisión, será responsable a la persona que le compre el valor, quien podrá entablar demanda para recobrar el precio pagado por el valor, además de intereses al tipo de interés aplicable a sentencias judiciales según provisto por el reglamento aprobado a estos efectos por la Junta Financiera creada por las secs. 2001 et seq. del Título 7, a partir de la fecha en que se hizo el pago, costas y razonables honorarios de abogado menos la cuantía de cualquier ingreso que haya recibido derivado del valor, al ofrecer devolver dicho valor, o por daños y perjuicios, si él ya no es dueño del valor. Art. 410(a)(2) de la Ley Uniforme de Valores, según enmendada, 10 LPRA sec. 890(a)(2).

El Art. 100(l) de la Ley de Valores de Puerto Rico, _supra_, define el término "valor" como

> cualquier pagaré, acción, acciones en cartera, bono, vale, comprobante de deuda, certificado de interés o participación en algún convenio de distribución de beneficios o sociedad, certificado de valores fiduciarios en garantía, certificado de preorganización o subscripción, acción transferible, contrato de inversión, certificado de fideicomiso con derecho a voto, certificado de depósito en garantía, cuota de interés indiviso en petróleo, gas u otros derechos sobre minerales, o, en general, cualquier interés o instrumento conocido comúnmente como "valor", o cualquier certificado de interés o participación en cualquiera de los precedentes valores, certificado temporero o provisional o recibo por los mismos, garantía de dichos valores o instrumentos de

autorización u opción o derecho para subscribirlos. "Valor" no incluirá ninguna póliza de seguro, o de seguro dotal, ni contrato de anualidades mediante la cual una compañía de seguros se compromete a pagar una suma determinada de dinero, sea ésta pagadera en suma englobada o periódicamente, durante la vida de la persona o en cualquier otro período especificado.

Como podemos ver, la definición excluye las anualidades fijas. Por lo tanto, no están cubiertas por nuestra legislación de valores. De otro modo, la definición no especifica nada sobre las anualidades variables. Cabe destacar que los contratos de anualidad variable tienen elementos de las pólizas de seguros y de los valores. De ahí la dificultad para identificar si están cobijadas por las leyes de valores. J.A. Richardson, Is a Variable Annuity A "Security"?: Making Sense of Inconsistent State and Federal Securities Statutes, 14 WTR PIABA B.J. 38 (2007). Sin embargo, el Art. 13.450 del Código de Seguros de Puerto Rico, 26 LPRA sec. 1379, cataloga las anualidades variables como valores regulados por la Ley Uniforme de Valores, supra:

Sec. 1379. Ley Uniforme de Valores

Los poderes otorgados al Comisionado de Instituciones Financieras, al amparo de las secs. 851 a 895 del Título 10, conocidas como "Ley Uniforme de Valores", en torno a la reglamentación y supervisión de todos los aspectos de las anualidades variables, en tanto y cuanto éstas son valores, no serán afectados en forma alguna al entrar en vigor este artículo y las secs. 1366 y 1374 de este título. Estos valores, las anualidades variables, continuarán bajo la cobertura de la "Ley Uniforme de Valores" y los reglamentos aprobados al amparo de dicho estatuto.

En fin, la anualidad variable en controversia es un valor regulado por la Ley Uniforme de Valores. Por otro lado, en Olivella Zalduondo v. Triple S, supra, pág. 646, resolvimos que la Ley Uniforme de Valores no aplica a todos los casos que involucren valores. De hecho, la controversia de ese caso es distinguible de la que tenemos ahora ante nuestra consideración. Aquel caso trataba sobre una redención de acciones de una corporación. En cambio, la controversia de este recurso es sobre el rendimiento de una anualidad variable y la intención del legislador al respecto, plasmada en el Art. 13.450 del Código de Seguros, supra, es que las anualidades variables se clasifican como valores y, por consiguiente, están reguladas por la Ley Uniforme de Valores.

Esa ley establece un periodo prescriptivo de dos años, desde que se efectuó el contrato de compraventa, para entablar una reclamación civil por prácticas fraudulentas en el mercado de valores. Art. 410(e) de la Ley Uniforme de Valores, 10 LPRA sec. 890(e). En PaineWebber, Inc. v. First Boston, supra, nos enfrentamos a la controversia de si el periodo prescriptivo que aplica en una reclamación de daños por incumplimiento de un contrato de transacciones de valores es el de quince años del Art. 1864 del Código Civil, 31 LPRA sec. 5294, el de tres años del Art. 942 del Código de Comercio, 10 LPRA sec. 1904, o el de dos años que surge del Art. 410(e) de la Ley Uniforme de Valores, supra. En nuestro análisis mencionamos que del informe conjunto de las Comisiones de lo Jurídico Civil e Industrial y Comercio del Senado de Puerto Rico surge que las disposiciones del Código Civil y del Código de Comercio eran insuficientes para atender las controversias que surgieran sobre valores, por lo que se decidió adoptar la Ley de Valores. Diario de Sesiones,

supra, pág. 1629. Además, tuvimos oportunidad de interpretar el Art. 410 (h) de la Ley de Valores, 10 LPRA sec. 890(h), el cual indica:

> Los derechos y remedios provistos por este capítulo son en adición a cualesquiera derechos o remedios que puedan existir, pero este capítulo no creará una causa de acción no especificada en esta sección o en la sec. 862(e) de este título.

Concluimos entonces que este artículo se refiere a que se aplicarán otros remedios cuando se trate de conductas y situaciones relacionadas con valores, pero no previstas por la Ley de Valores. Permitir remedios bajo otras leyes cuando hay una ley especial dejaría inoperante una ley que se adoptó con el propósito de atender la particularidad del mercado de valores. PaineWebber, Inc. v. Forst Boston, Inc., supra, pág. 547.

En cambio, el Juez Asociado Negrón García emitió un voto disidente en PaineWebber, Inc. v. Forst Boston, supra, en el cual entendió que el Artículo 410(h) de la Ley de Valores, supra, no es un remedio exclusivo para controversias de valores, sino adicional a los existentes. Como uno de sus fundamentos, utilizó lo resuelto en Rouseff v. Dean Witter & Co., Inc., 453 F. Supp. 774, 780-782 (D. Ind. 1978). Sin embargo, este caso no es aplicable a esa controversia, ya que lo que discute es el tema de preemption entre la ley federal de valores y la legislación de valores del estado de Indiana.

Por su parte, el Profesor Carlos E. Díaz Olivo, analizó el caso de PaineWebber, Inc. v. Forst Boston, supra. Concluyó que el Art. 410 (h) de la Ley de Valores, supra, no es un remedio exclusivo. Sin embargo, cuando analizamos lo que dicen los

estudiosos del tema sobre la sección equivalente en la Ley Modelo de Valores de 1956, de la cual proviene nuestra Ley de Valores, estos indican que se recurre a remedios o causas de acciones generales cuando las leyes de valores no proveen una causa de acción específica y que el propósito del artículo es evitar acciones implícitas (*foreclose implied actions*). L. Loss, Fundamentals of Securities Regulation, Boston. Ed. Little Brown and Co., 1988, pág. 879; L. Loss y E. M. Cowett, Blue Sky Laws, Boston, Ed. Little, Brown and Co., 1958, pág. 156. A través de esta doctrina se le da una causa de acción a una persona por una violación de un estatuto que no contiene una causa de acción para esa conducta prescrita. IX Loss, Seligman, Paredes, Securities Regulation 195-196 (2013). Véase también Hofmayer v. Dean Witter & Co., 459 F. Supp. 733 (N.D. Cal. 1978); Brumm v. McDonald & Co. Securities, Inc., 78 Ohio App.3d 96 (1992); Komanoff v. Mabon, Nugent & Co., 884 F. Supp. 848 (S.D.N.Y. 1995); Geyer v. Paine, Webber, Jackson & Curtis, Inc., 389 F. Supp. 678 (D. Wyo. 1975); Avern Trust v. Clarke, 415 F.2d 1238 (7TH Cir. 1969); Buttery v. Merril Lynch, Pierce, Fenner & Smith, Inc., 410 F. 2d 135 (7th Cir. 1969). Un ejemplo es el estado de New York, que no provee una causa de acción privada para compensar a las personas que sufren daños por conductas proscritas en su ley estatal de valores. A. J. Gana y M. Villacres, Blue Skies for America in the Securities Industry… Except for New York: New York's Martin Act and the Private Right of Action, 19 Fordham J. Corp. & Fin. L. 587 (2014). Como podemos ver, esta doctrina no aplica en Puerto Rico, ya que nuestra ley de valores ofrece un remedio civil para las personas que sufren daños por las conductas expresamente proscritas en esa ley.

Tampoco existe una causa de acción contractual bajo el Reglamento de la Ley Uniforme de Valores, Reglamento Núm. 6078 del 18 de febrero de 2000, aunque este proscribe la conducta alegada por el señor Méndez Moll en este caso. El Art. 49 del Reglamento, supra, indica las sanciones y remedios que tiene disponible una persona que alega que fue víctima de una de las conductas proscritas. Específicamente este artículo indica:

> Cualquier persona que haya violado o esté próxima a dedicarse a cualquier acto o práctica que constituya una violación de cualquier disposición de Ley, este reglamento, o de cualquier regla u orden del Comisionado emitida al amparo de la Ley o este reglamento, estará sujeta, entre otras a los remedios y sanciones provistos por la Ley y a los remedios y sanciones provistos por la Ley. Núm 4 del 11 de octubre de 1985, según enmendada. Art. 49 del Reglamento, supra. [Ley se refiere a la Ley Uniforme de Valores de Puerto Rico].

De lo anterior surge que el reglamento reconoce que el único remedio disponible para una persona que alega una conducta proscrita por este reglamento es el dispuesto por la Ley de Valores de Puerto Rico y los que provee la Ley de la Oficina del Comisionado de Instituciones Financieras, Ley Núm. 4 del 11 de octubre de 1985, según enmendada. Esta última contempla la penalidad de multas administrativas.

Al referirse a otras medidas y sanciones, el reglamento contempla la aplicación de cualquier ley especial. No se refiere al periodo prescriptivo de la ley general, pues esta nunca prevalece sobre la ley específica. Como resolvimos en PaineWebber, Inc. v. First Boston, supra, págs. 546-547 la Ley Uniforme de Valores es una ley especial que prevalece sobre las disposiciones del Código Civil y el Código de Comercio. Por ende, el periodo prescriptivo que aplica en reclamaciones de

daños y perjuicios en pleitos sobre valores es el de dos años, dispuesto en el Art. 410(e) de la Ley Uniforme de Valores, *supra*.

Además, es erróneo concluir que nuestra reglamentación incorporó todos los reglamentos de la Security Exchange Commission (SEC) y los de la National Association of Securities Dealers (NASD). La Sec. 52.2 del Art. 52 del Reglamento, *supra*, señala que

> [l]as reglas emitidas por la "SEC" y la "NASD" a tenor con las disposiciones de las diferentes leyes de los Estados Unidos sobre valores y asesores de inversiones, según estas se mencionan y a las que se hacen referencia en este reglamento, incluyendo cualquier regla subsiguiente adoptada para enmendarlas, sustituirles o suplementarlas, quedan por la presente incorporadas a este reglamento por referencia y se hacen constar como parte del mismo.

Como vemos, no se incorporan todas las reglas, sino solo las que se mencionan en el Reglamento, más sus enmiendas. Las causas de acción que existen cuando se viola una conducta proscrita por alguna de las reglas incorporadas son las mencionadas en el Art. 49 del Reglamento, *supra*. Como nuestro reglamento provee como único remedio las causas de acción de la Ley de Valores, no cabe hablar de una causa de acción adicional por incumplimiento de contrato.

Por todo lo anterior concluyo que la reclamación que nos ocupa no se rige por las disposiciones generales sobre contratos del Código Civil, pues se alega una de las violaciones de las prácticas proscritas por los Arts. 101 y 102 de la Ley de Valores, *supra*. Asimismo, el Art. 410(a)(2) de esa legislación, *supra*, provee al señor Méndez Moll una causa de acción para

reclamar por los daños sufridos por engaño o fraude en la venta de una anualidad variable, como lo es el Acummulator Plus. Sin embargo, como el contrato de compraventa se celebró en 2004 y la demanda se entabló el 13 de febrero de 2013, la causa de acción está prescrita ya que transcurrieron más de dos años. Recordemos que el señor Méndez Moll declaró que se percató de que el producto que adquirió no era lo que deseaba después que depositó la contribución inicial. Sin embargo, no hizo nada, ya que el producto estaba funcionando bien, es decir, como él quería. Como ya mencionamos, no fue hasta febrero de 2013 que el señor Méndez Moll presentó la demanda. Por lo tanto, la causa de acción del señor Méndez Moll está prescrita. De igual modo prescribió la acción contingente de su esposa, la Sra. Román Hernández.

III

La Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, permite al demandado presentar una moción de desestimación cuando entienda que la alegación deja de exponer una reclamación que justifique la concesión de un remedio. Véanse, Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 935 (2011); Sánchez v. Aut. de los Puertos, 153 DPR 559, 569 (2001). A la hora de resolver este tipo de moción de desestimación tenemos que tomar como ciertas y buenas todas las alegaciones fácticas de la demanda. Rivera San Feliz et al. v. Jta. Dir. FirstBank, 193 DPR 38, 49 (2015); El Día, Inc. v. Mun. de Guaynabo, 187 DPR 811, 821 (2013). De esta forma, el promovente de la moción de desestimación tiene que ponernos en posición de poder concluir que aun tomando como ciertas y buenas las alegaciones, la demanda no expone ninguna reclamación que justifique un remedio.

Pressure Vessels P.R. v. Empire Gas P.R., 137 DPR 497, 505 (1994).

Para desestimar la demanda tiene que surgir con toda certeza que el demandante no cuenta con un remedio en derecho, bajo cualesquiera hechos bien alegados que puedan ser probados. Íd. Véase también, Consejo de Titulares v. Gómez Estremera et al., 184 DPR 407, 423 (2012). Asimismo, tenemos que tener en cuenta que la Regla 6.3 de Procedimiento Civil, 32 LPRA Ap. V, solo requiere que la demanda contenga una relación sucinta y sencilla de los hechos que demuestren que el peticionario tiene derecho a un remedio, pues su propósito es notificar a la parte demandada de las reclamaciones en su contra para que esta pueda preparar su defensa. Sánchez v. Aut. de los Puertos, supra, págs. 569-570.

En vista de lo anterior, concluimos que tomando como ciertos todos los hechos bien alegados por el señor Méndez Moll, no existe causa de acción que justifique la concesión de un remedio. La causa de acción está prescrita ya que el contrato de compraventa se celebró en enero de 2004 pero la demanda se presentó el 13 de febrero de 2013, más de siete años después que prescribió la acción.

Resolver lo contrario contradice un precedente. Hemos establecido que para revocar un precedente hay que determinar: "(1) si la decisión anterior era claramente errónea; (2) si sus efectos sobre el resto del ordenamiento son adversos, y (3) si la cantidad de personas que confiaron en ésta es limitada". Pueblo v. Sánchez Valle, 192 DPR, 645-646 (2015). De lo explicado anteriormente surge que en este caso no se dan estas circunstancias. La ley, los reglamentos y la jurisprudencia

sobre valores son claros en que cuando hay una causa de acción específica para la conducta alegada esa es la que aplica. Por lo tanto, la norma establecida en el caso de PaineWebber, Inc. v. Forst Boston, supra, y reafirmada en Olivella Zalduondo v. Triple S., supra, es correcta.

La voluntad del legislador era crear una ley que atendiera la particularidad y la complejidad del tráfico de valores. Precisamente, por esa razón creó una causa de acción para las personas que sufran daños por las conductas proscritas y se estableció un periodo prescriptivo diferente a los que se disponen en el Código de Comercio y el Código Civil. Si aplicáramos los remedios y periodos prescriptivos de otras leyes, ¿qué sentido tendría que la Ley de Valores tenga una causa de acción y un periodo prescriptivo especial para atender los asuntos de valores? Esa conclusión dejaría prácticamente inoperante una ley. Además, permitir la aplicación de otros remedios y periodos prescriptivos afectaría las transacciones comerciales al imponer cargas indebidas al tráfico de valores. Eso crearía incertidumbre en cuanto a los procedimientos judiciales y sería perjudicial para nuestra economía, ya en crisis.

Puede que el resultado que propongo no sea agradable, pero nuestro deber se limita a interpretar la ley y resolver de acuerdo con el derecho vigente. Cualquier cambio sería una tarea que la Constitución encomendó a la Asamblea Legislativa.

Según lo expuesto, procede la desestimación de la demanda porque la causa de acción está prescrita. Es por esto que revocaría la sentencia del Tribunal de Apelaciones y desestimaría todas las causas de acción presentadas por el señor

Méndez Moll y su esposa, la señora Román Hernández, contra AXA y el señor Gesualdo Pérez. Como este Tribunal resuelve lo contrario disiento respetuosamente.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado